No. 25-60052

# In the United States Court of Appeals
# for the Fifth Circuit

SOUTHWEST AIRLINES CO.,

*Petitioner,*

*v.*

TRANSPORTATION SECURITY ADMINISTRATION,

*Respondent.*

On Petition for Review of the Transportation Security
Administration's Final Decisions Dated December 16, 2024

**BRIEF OF PETITIONER SOUTHWEST AIRLINES CO.**

Jonathan F. Cohn
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
(512) 693-8350

Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
900 Sixteenth St. NW
Washington, DC 20006
(202) 626-5800

Kyle D. Hawkins
  *Counsel of Record*
William T. Thompson
Todd L. Disher
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
kyle@lehotskykeller.com

*Counsel for Petitioner*

## CERTIFICATE OF INTERESTED PERSONS

No. 25-60052

Southwest Airlines Co.,

*Petitioner,*

*v.*

Transportation Security Administration,

*Respondent.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification of recusal.

**Petitioner:**

Southwest Airlines Co. is a Texas organization. It has no parent corporation. No corporation owns 10% of more of its stock.

**Counsel for Petitioner:**

Kyle D. Hawkins (lead counsel)

Jonathan F. Cohn

William T. Thompson

Todd L. Disher

LEHOTSKY KELLER COHN LLP

Adam P. Feinberg

MILLER & CHEVALIER CHARTERED

**Respondent:**
Transportation Security Administration

**Counsel for Respondent:**
Daniel Tenny
Weili Shaw
UNITED STATES DEPARTMENT OF JUSTICE

Mary Kate Whalen
TRANSPORTATION SECURITY ADMINISTRATION

/s/ *Kyle D. Hawkins*
Kyle D. Hawkins
*Counsel of Record for*
*Petitioner*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner Southwest Airlines Co. respectfully requests oral argument. This case presents a critical question of statutory interpretation that implicates tens of millions of dollars. At issue is the "security service fee" that Congress authorized Respondent Transportation Security Administration to collect from "passengers of air carriers . . . in air transportation" to fund certain "costs of providing civil aviation security services." 49 U.S.C. § 44940(a)(1). But when a customer cancels a ticket, he never becomes a "passenger," and he never avails himself of "aviation security services." Nevertheless, TSA, in the final administrative decisions now before this Court, claims that it is entitled to keep the security service fee for some canceled tickets.

Oral argument is likely to assist the Court's consideration of these weighty issues of nationwide import.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons............................................................i

Statement Regarding Oral Argument ............................................... iii

Table of Authorities............................................................................ vi

Introduction..........................................................................................1

Statement of Jurisdiction .....................................................................3

Issues Presented....................................................................................3

Statement of the Case ...........................................................................4

    I.   Statutory and Regulatory Background ....................................4

       A.  Congress Imposes the Security Service Fee on Airline
           Passengers to Fund TSA's Security Operations............................4

       B.  TSA Issues Regulations and Informal Guidance on the
           Collection and Refunding of Security Service Fees......................5

    II.  Factual and Procedural Background........................................8

       A.  Southwest Refunds Security Service Fees on
           Nonrefundable Tickets Through Residual Travel
           Funds. ........................................................................................8

       B.  TSA Audits Southwest and Assesses Liability. ...........................10

       C.  On Administrative Review, TSA's Chief Financial
           Officer Determines the Disputed Funds Should Go to
           TSA.........................................................................................12

Summary of the Argument ................................................................13

Standard of Review ...........................................................................16

Argument............................................................................................17

    I.   TSA Is Not Entitled to Security Service Fees for Customers
       Who Cancel Their Tickets and Never Travel.....................................17

A.  Section 44940's Operative Provisions Limit TSA's Entitlement to Fees to "Passengers" to Fund "Costs of Providing Civil Aviation Security Services." .............................. 17

B.  Section 44940's Ancillary Provisions Do Not Support TSA's View. .................................................................... 25

C.  TSA's Regulations and Informal Guidance Do Not Overcome the Statute. ................................................... 28

II.  Southwest Is Not Liable Because It Refunded the Security Service Fee to Its Customers When They Canceled Their Tickets. ............................................................................... 31

III.  The Orders Should be Vacated Because TSA Did Not Provide Fair Notice of Its View that Southwest's Refund Procedures Are Inadequate. .................................................. 34

A.  TSA Did Not Declare Its Position Until After Most of the Transactions at Issue in This Petition. ................... 35

B.  Southwest Could Not Have Reasonably Guessed TSA's Unnatural View of the Law, Which Has Shifted Multiple Times. .................................................................. 37

Conclusion .......................................................................................... 41

Certificate of Service ......................................................................... 42

Certificates of Compliance ................................................................ 42

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Airlines for Am. v. Dep't of Transp.*,
127 F.4th 563 (5th Cir. 2025) ................................................................16, 18, 32

*Alaska Airlines, Inc. v. Transp. Sec. Admin.*,
No. 25-954 (9th Cir. filed Feb. 13, 2025)........................................................40

*Allegiant Travel Co. v. Transp. Sec. Admin.*,
No. 25-960 (9th Cir. filed Feb. 13, 2025)........................................................40

*Calumet Shreveport Refining, L.L.C. v. EPA*,
86 F.4th 1121 (5th Cir. 2023) ..........................................................................20

*Caver v. Cent. Ala. Electric Coop.*,
845 F.3d 1135 (11th Cir. 2017) .......................................................................32

*CFTC v. EOX Holdings, L.L.C.*,
90 F.4th 439 (5th Cir. 2024) ......................................................................34, 37

*Davis v. Cent. Ala. Electric Coop.*,
No. 15-0131, 2015 WL 5285894 (S.D. Ala. Sept. 8, 2015)............................32

*Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*,
528 F.2d 645 (5th Cir. 1976) .....................................................................35, 37

*Feliciano v. Dep't of Trans.*,
145 S. Ct. 1284 (2025)......................................................................................20

*Frontier Airlines, Inc. v. Dep't of Homeland Sec.*,
No. 25-9523 (10th Cir. filed Feb. 12, 2025).....................................................40

*Gen. Electric Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995) ...................................................................34, 37

*Gloucester Ferry Co. v. Pennsylvania*,
  114 U.S. 196 (1885) ...................................................................................20

*Gulf Fisherman's Assoc. v. Nat'l Marine Fisheries Serv.*,
  986 F.3d 454 (5th Cir. 2020) ......................................................................18

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006) ...................................................................................26

*Inhance Techs., LLC v. EPA*,
  96 F.4th 888 (5th Cir. 2024) ...............................................................17, 18

*Jama v. Immigr. Customs Enf't*,
  543 U.S. 335 (2005) ...................................................................................27

*Jones v. Hendrix*,
  599 U.S. 465 (2023) ...................................................................................26

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .............................................................................16, 17

*Nat'l Religious Broads. v. Fed. Commc'ns Comm'n*,
  No. 24-60219, 2025 WL 1428620 (5th Cir. May 19, 2025)...........................16

*NFIB v. OSHA*,
  595 U.S. 109 (2022) ...................................................................................18

*Sackett v. EPA*,
  598 U.S. 651 (2023) ...................................................................................27

*Southwest Airlines Co. v. United States*,
  No. 22-141, 2025 WL 841847 (U.S. Ct. Int'l Trade Mar. 18,
  2025) ....................................................................14, 15, 17, 23, 24, 27, 28, 30

*Spirit Airlines, Inc. v. Transp. Sec. Admin.*,
  No. 25-10461 (11th Cir. filed Feb. 12, 2025)................................................40

*Turkiye Halk Bankasi A.S. v. United States,*
   598 U.S. 264 (2023) ...............................................................21, 26, 27

*United Airlines, Inc. v. United States,*
   111 F.3d 551 (7th Cir. 1997) ...............................................................38

**Statutes**

19 U.S.C. § 58c(a) ...............................................................24

19 U.S.C. § 58c(d) ...............................................................24, 26, 27, 28

26 U.S.C. § 4261 ...............................................................26

26 U.S.C. § 6415(a) ...............................................................33

49 U.S.C. § 114 ...............................................................4

49 U.S.C. § 40102(a) ...............................................................18, 19, 22

49 U.S.C. § 44901 ...............................................................4

49 U.S.C. § 44940 ...............................................................1, 4

49 U.S.C. § 44940(a) ...............................................................4, 18, 21, 22, 29, 30, 37

49 U.S.C. § 44940(b) ...............................................................4, 21

49 U.S.C. § 44940(c) ...............................................................4, 5, 19, 27

49 U.S.C. § 44940(d) ...............................................................4, 18

49 U.S.C. § 44940(e) ...............................................................5, 25, 26, 27, 28

49 U.S.C. § 44940(h) ...............................................................21

49 U.S.C. § 46110 ...............................................................3, 13

Tex. Bus. & Com. Code § 4.404 ...............................................................38

## Regulations

7 C.F.R. § 1767.41 ........................................................................33

14 C.F.R. § 399.85(f)(2) ..............................................................32

49 C.F.R. § 89.21(f) ......................................................................12

49 C.F.R. § 1510.1 ........................................................................28

49 C.F.R. § 1510.5 ..................................................................28, 29

49 C.F.R. § 1510.9 ..............................................................5, 6, 29

49 C.F.R. § 1510.11 ..............................................................6, 29

49 C.F.R. § 1510.19 ......................................................................10

66 Fed. Reg. 67698 (Dec. 31, 2001) ...........................................5

79 Fed. Reg. 35462 (June 20, 2014) ...........................................5

89 Fed. Reg. 34620 (Apr. 30, 2024) ..........................................32

Rev. Rul. 70-13, 1970-1 C.B. 272 ..............................................33

Rev. Rul. 89-109, 1989-2 C.B. 232, 233 ...................................33

## Other Authorities

Black's Law Dictionary (12th ed. 2024) ..............................18, 20

Black's Law Dictionary (4th ed. 1968) .........................................20

Fed. R. App. P. 15 ........................................................................13

Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ......19, 20

Southwest Newsroom, *Awards & Recognition*,
    https://www.swamedia.com/about-southwest/awards-and-
    recognition.............................................................................8

ix

The Am. Heritage Dictionary (5th ed. 2012)...............................................19, 20

## INTRODUCTION

This case pits Respondent Transportation Security Administration against the plain text of a statute. The statute—and Petitioner Southwest Airlines Co.—should win.

The statute at issue, 49 U.S.C. § 44940, arose in the aftermath of the September 11, 2001, attacks, to fund the newly created TSA through a "security service fee" chargeable to "passengers" travelling through U.S. airports for "air transportation." Southwest, like other airlines, typically collects the security service fee amounts when its customers buy their tickets and remits them to TSA on a monthly basis. When a customer cancels a ticket, Southwest refunds the security service fee amount to the customer. Depending on the type of ticket, that refund takes the form either of the original method of payment, or of a credit, known as a Residual Travel Fund (or RTF). In the past, RTFs carried expiration dates, and on occasion, a Southwest customer would cancel his ticket, receive a refund in the form of an RTF, and let the RTF expire unused.

In this dispute, TSA claims that it is entitled to security service fees for customers whose RTFs expired unused—even though that customer canceled his ticket, never became a "passenger," never engaged in "air transportation," never availed himself of any TSA service, and received a full refund in the form of an RTF. TSA is wrong. Section 44940 exists to fund TSA's security services with fees from the people who use those services—"passengers." There is no other plausible way to read the statute: A customer

who never becomes a "passenger" does not trigger the security service fee. Southwest should prevail on that basis alone.

And even if a fee could be triggered by a customer who cancels a ticket and never travels, that customer received a refund from Southwest. TSA has long taken the position that it is not entitled to a security service fee that is refunded to the customer. RTFs are refunds just like any other form of store credit. TSA's contrary view maintains that a "refund" turns not on what the merchant issued, but on some future action the customer may or may not take. Put another way, TSA believes that an RTF is a refund if it gets used, but is not a refund if, at some point in the future, it does not get used. That view finds no support in any statute, regulation, or other law—because it is wrong.

What's more, despite repeated audits after enactment of the fee statute in 2001, TSA did not explain to Southwest its unsound view that expired RTFs are not "refunds" until July 2018—after the first audit underlying this case. Congress's pronouncements in section 44940 trump TSA's inconsistent guidance, but regardless, the fair-notice doctrine prohibits TSA from ambushing airlines with a surprising and unnatural reading of the law that runs contrary not only to how Southwest has operated for many years, but how countless merchants across innumerable industries handle refunds.

This Court should enforce the statute. The Petition for Review should be granted, TSA's final decisions should be set aside, and TSA should be ordered to refund the amounts at issue to Southwest.

2

## STATEMENT OF JURISDICTION

On December 16, 2024, TSA issued its final agency decisions rejecting Southwest's timely request for administrative review. AR1181-92; AR1292-303. Southwest timely filed this Petition for Review in this Court on January 30, 2025, within the 60-day statutory deadline. 49 U.S.C. § 46110(a). This Court's jurisdiction is invoked under 49 U.S.C. § 46110.

## ISSUES PRESENTED

TSA claims it is entitled to security service fees as to tickets that were canceled by customers who never traveled, even though Southwest refunded the security service fees on each canceled ticket, and even though it first notified Southwest of its unnatural interpretation of "refund" after most of the transactions at issue.

The issues presented are:

1. Whether TSA is entitled to security service fees when customers cancel their tickets and never travel.

2. Whether TSA is entitled to security service fees when customers who received refunds in the form of a residual travel fund let the RTF expire unused.

3. Whether TSA's final decision should be vacated because TSA never provided Southwest fair notice that Southwest's refund practices do not comport with TSA's view of the law.

## STATEMENT OF THE CASE

### I.  Statutory and Regulatory Background

### A.  Congress Imposes the Security Service Fee on Airline Passengers to Fund TSA's Security Operations.

**1.** Following the terrorist attacks of September 11, 2001, Congress enacted the Aviation and Transportation Security Act, 49 U.S.C. §§ 44901 *et seq.,* which established TSA and charged it with maintaining civil aviation security, *see* 49 U.S.C. § 114 (outlining the function and responsibilities of TSA).

Congress decided that these new security services would be funded by the people who avail themselves of the services. That policy determination is codified at 49 U.S.C. § 44940. The statute requires TSA to "impose a uniform fee[] on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States." 49 U.S.C. § 44940(a)(1). Congress emphasized that this security service fee applies to "transportation of a passenger." *Id*. § 44940(d)(2).

The security service fee is "to pay for [enumerated] costs of providing civil aviation security services" supplied by TSA, such as airport screening personnel and equipment, air marshals, and training of pilots and flight attendants. *Id*. § 44940(a)(1). Congress directed TSA to "ensure that the fees are reasonably related to [TSA's] costs of providing services rendered." *Id*. § 44940(b). While the statutory scheme gives TSA some flexibility to determine the amount of the security service fee, that discretion is capped at "$5.60 per one-way trip in air transportation or intrastate air transportation

4

that originates at an airport in the United States, except that the fee imposed per round trip shall not exceed $11.20." *Id*. § 44940(c)(1).

**2.** Each airline collects the security service fee from its customers, typically at the time of booking. *See generally id.* § 44940(e)(2) (noting fees collected by air carrier); 49 C.F.R. § 1510.9(b) (detailing collection of security service fee). The statute requires airlines to remit to TSA the security service fees they collect on a monthly basis. *See* 49 U.S.C. § 44940(e)(3).

## B.  TSA Issues Regulations and Informal Guidance on the Collection and Refunding of Security Service Fees.

Following section 44940's enactment in November 2001, TSA issued regulations and informal industry guidance. Three such pronouncements are relevant to this dispute.

**1.** The month after section 44940 was enacted, TSA promulgated an interim final rule to regulate among other things various logistical matters surrounding security-service-fee payments. *See* 66 Fed. Reg. 67698-701 (Dec. 31, 2001). TSA amended the regulations in an interim final rule in 2014. *See* 79 Fed. Reg. 35462 (June 20, 2014). Two regulations are particularly implicated in this case.

First, in 49 C.F.R. § 1510.9, TSA regulates the "collection of security service fees." It directs air carriers to collect security service fees "based on the air travel itinerary at the time the air transportation is sold." *Id*. § 1510.9(b). It adds that "[a]ny changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air

carrier or foreign air carrier, as appropriate." *Id*. Like section 44940, section 1510.9 speaks only to "passengers," using that term ten times. It does not elaborate on what constitutes a "refund" as it uses that term in subsection (b).

Second, in 49 C.F.R. § 1510.11, TSA addresses "handling of security service fees." It emphasizes the link between security service fees and actual passenger costs, proclaiming that the security service fees collected by airlines "are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in" section 44940. *Id*. § 1510.11(b). It adds that an airline "holds neither legal nor equitable interest in the security service fees," with certain exceptions not implicated here. *Id.* Section 1510.11 does not address or define "refund" as that term appears elsewhere in the regulations.

**2.** In November 2002, TSA's Acting Director of Revenue issued what is known as the 2002 guidance letter. AR3-4 That letter purports to address the refundability of security service fees "to ticket purchasers who do not travel on their scheduled flights, particularly where the tickets are nonrefundable and have no value toward future travel." AR3. The letter states that if a ticket is not used, and if the "ticket purchaser requests a refund of the September 11th Security Fee collected, the carrier must provide the requester with a full refund of the fee." *Id*.

Although the underlying statute relies on the term "passenger" when describing security service fees, the 2002 guidance letter uses the term

"purchaser"—which appears nowhere in section 44940—to discuss refunds. It states that if a carrier remits a security service fee "to TSA and then refunds the fee to a ticket purchaser, the carrier may offset the refund by deducting it from the [fees] remitted to TSA for the month in which the refund is provided." AR4. The 2002 guidance letter also asserts that if "an air carrier does not refund [the security service fees] to the ticket purchaser, the fees must be remitted to or remain with TSA." *Id*.

The 2002 guidance letter, like the regulations, does not define "refund" or provide examples of what types of remittances do or do not constitute a "refund."

**3.** Nearly two decades later, in March 2020, TSA issued another informal guidance document labeled "Guidance to Industry." AR652. Issued at the outset of the COVID-19 pandemic, the 2020 guidance document set out to "uniformly address recent inquiries" and "provide uniform clarification" regarding "refunds to passengers" of the security service fee. *Id*.

This "guidance letter" explained: "When requested by a passenger, TSA considers a passenger fee refund a return of payment preferably in the form of original payment." *Id*. TSA then announced its view that "[r]etaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund." *Id*. The guidance document cites no authority to support either proposition.

7

## II. Factual and Procedural Background

### A. Southwest Refunds Security Service Fees on Nonrefundable Tickets Through Residual Travel Funds.

Petitioner Southwest Airlines Co. is the nation's highest rated airline when it comes to customer satisfaction. Founded in 1967 in San Antonio, Texas, Southwest prides itself on delivering a high level of hospitality and customer service. The J.D. Power 2024 North America Airline Satisfaction Study recently ranked Southwest the number one airline for economy class customer satisfaction for the third consecutive year.[1]

Generally speaking, Southwest sells both "refundable" and "nonrefundable" tickets, though those colloquialisms elide important legal nuance. When a customer purchases a refundable ticket, he typically pays the airfare, taxes, and the security service fee at the time of booking. If he later cancels the ticket, the full amount of his purchase, including all taxes and the security service fee, will be returned to the original method of purchase, unless he chooses a different form of refund.

When a customer purchases a so-called nonrefundable ticket, he can still cancel the ticket. If he does, Southwest will, pursuant to the terms of the Contract of Carriage, issue him a travel credit in the full amount of the purchase, including airfare, taxes, and the security service fee. AR133, AR238-

---

[1] This and other customer-satisfaction awards are listed at: Southwest Newsroom, *Awards & Recognition*, https://www.swamedia.com/about-southwest/awards-and-recognition.

39, AR784, AR1190-91 n.12, AR1301 n.11. This credit is referred to as a "Residual Travel Fund" or an "RTF." AR239, AR784. An RTF is an electronic account in the customer's name that can be used to purchase Southwest tickets—just like a gift card or a store credit. AR239, AR784. During the relevant periods at issue in this Petition, RTFs expired one year after the issuance of the ticket that was canceled in exchange for the RTF. AR239, AR784.

When Southwest issues either a method-of-payment refund or an RTF, all of the accounting entries associated with the sale of the ticket are reversed. AR256, AR799. That includes removing the amount of the security service fee from its TSA Fee Liability Account because it has been refunded to the customer, resulting in those funds not being paid to TSA (or being recalled from TSA if they had already been paid). AR256, AR799.

When a customer uses an RTF to purchase a new ticket, it works just like a normal purchase. Southwest collects and remits any applicable security service fees associated with any resulting transportation. AR256-57, AR799-800. If an RTF eventually expires unused, Southwest recognizes the amount of the RTF as revenue at that time in a separate transaction from the earlier issuance of the RTF. AR257, AR800.

Southwest has done things this way for many years. *See* AR772; *see also* AR768, AR1303 n.14. Prior to the audits now before the Court, TSA had never expressed any concern with how Southwest refunds the security service fee on nonrefundable tickets, despite having conducted similar prior audits.

9

## B. TSA Audits Southwest and Assesses Liability.

TSA periodically audits airlines for their security-service-fee compliance. *See* 49 C.F.R. § 1510.19. Two such audits are at issue here, both carried out on TSA's behalf by U.S. Customs and Border Protection ("CBP") audit staff. The first audit covered January 2015 through October 2016 and culminated in an audit report dated December 19, 2017. AR8-69. The second audit covered November 2016 through March 2019 and culminated in an audit report dated August 17, 2021. AR653-93.

During the periods covered by the audits, Southwest remitted more than $3 billion in security service fees to TSA. AR10, AR655. After reviewing several hundred tickets during each audit, the auditors flagged a single issue relating to canceled tickets. The auditors reviewed numerous tickets that had been canceled by the customer and that were either refunded to the customers' original form of payment (typically a credit card), exchanged for an RTF that was later used to purchase a new ticket, or exchanged for an RTF that later expired unused. *E.g.*, AR17-18, AR163-67, AR661-63. In the first audit, there were 28 RTFs issued in exchange for canceled tickets, and 18 of those were used by the customer to purchase new tickets; the remainder eventually expired unused. AR165-66. In the second audit, there were 683 RTFs issued in exchange for canceled tickets, and 517 of those were used by the customer to purchase new tickets; the remainder eventually expired unused. AR662. Thus, over both audit periods, more than 75% of the RTFs issued in exchange for canceled tickets were used to buy new tickets.

Although Southwest's policies had been in place for many years, the auditors treated canceled tickets exchanged for RTFs that expired during the audit period as "errors." AR18-20, AR662, AR669-70. They alleged:

> For each identified error, Southwest collected fees from the passenger on behalf of TSA for the security service fees associated with the purchased air transportation. For each of the errors, the passengers did not use the purchased ticket and were issued an RTF by Southwest that went unused and eventually expired. Upon expiration of the RTF, Southwest gained an equitable interest in the collected fees by recognizing the amounts as revenue and neither refunding the fees to the purchaser nor remitting the fees to TSA. . . . The determination as to whether an RTF constitutes as refund of any collected [security service fees] cannot be made until the RTF either expires unused or is used to purchase new air transportation . . . .

AR69, AR693.

Although the auditors asserted that the supposed "error" tickets involved only nominal security service fee amounts (14 "errors" equivalent to $78.40 in the first audit, and 249 "errors" equivalent to $1,394.40 in the second audit), the auditors extrapolated those supposed "errors" across Southwest's entire universe of security service fee remittances to calculate a $15,969,705.22 liability in the first audit for the 2015-16 period, and a $32,031,605.39 liability in the second audit for the 2016-19 period. AR18-20, AR662, AR669-70. The auditors charged these as errors based on TSA's regulations, the 2002 guidance letter, and the 2020 guidance document discussed above. *Supra* pp. 6-7.

The auditors did not treat as "errors" any canceled tickets that were exchanged for RTFs that were later used in whole or in part to purchase new tickets. AR166, AR662, AR771.

TSA adopted the audit reports and subsequently sent them to Southwest along with liability assessments. AR70-73, AR694-97. Pursuant to 49 C.F.R. § 89.21(f), Southwest sought administrative review of TSA's two liability assessments. Southwest timely submitted the first such request for review on August 9, 2018. AR76-92. For years, TSA did not act on that request. Instead, TSA engaged CBP to undertake the second audit in 2020, culminating in the second audit report and a second liability assessment in 2021. AR653, AR655, AR694-97. Southwest timely submitted its request for review of that second assessment on November 23, 2021. AR701-19.

## C. On Administrative Review, TSA's Chief Financial Officer Determines the Disputed Funds Should Go to TSA.

More than six years after Southwest's first request for review and three years after the second one, TSA issued final decisions on both requests for review on December 16, 2024. *See* AR1292-1303 (decision on first request for review); AR1292-1303 (decision on second request for review). Those decisions were issued by TSA's own Chief Financial Officer, whom TSA has designated to oversee the administrative review process. Within 30 days of the decisions' issuance, Southwest paid in full the amounts in dispute to TSA.

The final decisions purport to address both of Southwest's main arguments. They first reject Southwest's position that TSA has authority to obtain

12

funds only when there is a passenger who travels on an aircraft. AR1186-87, AR1297-98. They next reject Southwest's argument that expiring RTFs are refunds and that TSA failed to give fair notice of its contrary interpretation. AR1189-92, AR1300-03. TSA asserts that "Southwest's contention that creating an expiring credit in the form of RTF is a refund of the Fee cannot be squared with its regulatory obligations regarding the Fee" and that "[t]his expiring credit arrangement is not a refund of the Fee to the passenger in any material sense, as Southwest has not returned or repaid the Fee amount to the passenger." AR1190-91, AR1301-02. But the final decisions agree that RTFs constitute refunds when used. AR1185, AR1188, AR1189 & n.11, AR1296, AR1299-1300. Nowhere in the final decisions does TSA define the word "refund" or cite any pre-2020 authority suggesting that expiring credit does not qualify as a refund.

Southwest timely filed this Petition for Review. *See* 49 U.S.C. § 46110; Fed. R. App. P. 15.

## SUMMARY OF THE ARGUMENT

**I.A.** Agencies are limited to the powers conferred on them by Congress, and here, Congress has never granted TSA the power to retain security service fees as to customers who purchase tickets but later cancel those tickets and never travel. In those situations, the customer never becomes a "passenger." Dictionaries and common usage confirm that "passenger" involves "travel." Likewise, the statutory term "trip" is tied to "a journey." And

Congress's reference to "air transportation" necessarily invokes the movement of people from one place to another. None of those concepts applies to someone who cancels a ticket and never flies on an airplane.

Were there any doubt, the statute makes clear that the security service fee exists to pay for the "costs of providing civil aviation security services." This Court has a duty to read statutes holistically, and there is no proper basis to read "passenger," "trip," and "air transportation" divorced from the express funding purpose written into the statutory text. A customer who cancels a ticket and never travels does not avail himself of or incur costs associated with the enumerated security services, which only confirms that such customers fall outside the statutory language.

TSA has no plausible textual response to these overwhelming indicators of congressional intent, and its position would lead to absurd results. For example, under TSA's view, it would be entitled to the security service fee even when a customer cancels a refundable ticket and receives a full refund to the original method of payment. TSA offers no sound explanation as to why the statute entitles it to a security service fee in these instances. Indeed, it implicitly admitted it is not entitled to such fee amounts when in the audits it found no errors associated with tickets refunded to the original form of payment.

In a similar dispute involving an analogous fee administered by CBP, the Court of International Trade recently endorsed the same reasoning Southwest offers this Court. *Southwest Airlines Co. v. United States*, No. 22-141, 2025

WL 841847 (U.S. Ct. Int'l Trade Mar. 18, 2025), *appeal pending*, No. 2025-1797 (Fed. Cir.), considered whether CBP was entitled to customs inspection fees collected for certain international airline tickets that were later canceled and never used. Like TSA here, the government in *Southwest Airlines* argued that once an airline collects the fee, it must remit it to the agency, whether or not there is a passenger who flies. The Court of International Trade squarely rejected that argument, largely for the reasons Southwest advances here. This Court should hold the same and avoid creating a conflict with the Court of International Trade's sound reasoning.

**B.** Section 44940 includes a number of ancillary and administrative provisions, some of which TSA invoked below to support its view. But each is irrelevant on its own terms, and in any event, TSA errs in suggesting that these technical provisions override the operative heart of the security service fee statute.

**C.** TSA's own regulations and informal industry guidance do not overcome the statutory text. For one thing, the regulations largely track the core statutory terms related to "passengers" and "air transportation," all of which support Southwest's view. TSA's other regulations beg the question by assuming the applicability of the security service fee under section 44940(a)(1). And in any event, regulations cannot override statutory pronouncements.

\* \* \*

Because TSA's final decisions conflict with the operative statute, the Court should vacate those decisions. It need not reach the remaining issues.

**II.** There is an alternative basis to vacate the final decisions below. Southwest refunded the security service fees to every customer who canceled a ticket. Southwest issued some refunds in the form of an RTF, consistent with TSA's concession that an RTF is a refund if the customer uses it before expiration. TSA claims that an RTF is not a refund if it later expires unused, but that untenable position finds no support in any statute or regulation. And it defies reasonable business expectations: "store credit" is the tried-and-true refund method across countless industries.

**III.** TSA cannot enforce its counterintuitive interpretation of "refund"—announced only after most of the transactions at issue—against Southwest. The fair-notice doctrine prohibits such retroactive liability.

## STANDARD OF REVIEW

This Court "review[s] questions of statutory interpretation de novo," including claims that an agency "does not have statutory authority" to take the challenged action. *Airlines for Am. v. Dep't of Transp.*, 127 F.4th 563, 571 (5th Cir. 2025) (citation omitted); *see also Nat'l Religious Broads. v. Fed. Commc'ns Comm'n*, No. 24-60219, 2025 WL 1428620, at *9 (5th Cir. May 19, 2025) (granting petition for review when agency "lacks statutory authority"). As the Supreme Court explained last year, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and "must exercise their independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v.*

*Raimondo*, 603 U.S. 369, 394, 412 (2024). That requires this Court to "determine the best reading of the statute"; a merely permissible reading is not enough *Id*. at 400.

**ARGUMENT**

## I. TSA Is Not Entitled to Security Service Fees for Customers Who Cancel Their Tickets and Never Travel.

The security service fee statute permits TSA to collect a fee from "passengers of air carriers . . . in air transportation" to fund certain "costs of providing civil aviation security services." When a customer cancels a ticket, he never becomes a "passenger." And he never uses "security services." Agreeing with this plain-text reading, the Court of International Trade recently rejected similar arguments advanced by CBP as to an analogous fee regime for international tickets. *See Southwest Airlines Co. v. United States*, No. 22-141, 2025 WL 841847, at *9 (U.S. Ct. Int'l Trade Mar. 18, 2025), *appeal pending*, No. 2025-1797 (Fed. Cir.). The easiest way to resolve this Petition is to agree with the Court of International Trade's reasoning and vacate the final decisions because TSA thus lacks statutory authorization to retain the security service fee when no passenger travels.

### A. Section 44940's Operative Provisions Limit TSA's Entitlement to Fees to "Passengers" to Fund "Costs of Providing Civil Aviation Security Services."

**1.** We begin with first principles. "[A]gencies, as mere creatures of statute, must point to explicit Congressional authority justifying their

17

decisions." *Inhance Techs., LLC v. EPA*, 96 F.4th 888, 893 (5th Cir. 2024) (citation omitted); *see also Airlines for Am.*, 110 F.4th at 675. "[S]ilence" or "gaps" in a statute means the agency has no authority to act, and "Congress does not delegate authority merely by not withholding it." *Gulf Fisherman's Assoc. v. Nat'l Marine Fisheries Serv.*, 986 F.3d 454, 456, 460 (5th Cir. 2020). Agencies like TSA "possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam).

The proper way to resolve this dispute is to carefully analyze Congress's pronouncements to determine whether it has entitled TSA to retain security service fees as to customers who purchase tickets but later cancel them and never fly. The text of the statute authorizes TSA to collect a security service fee from a "passenger" who takes a "trip" "in air transportation," in order to fund the "costs of providing civil aviation security services." 49 U.S.C. § 44940(a)(1), (b), (c)(1); *see also id.* § 44940(d)(2) (the security service fee is imposed "on transportation of a passenger"). TSA is not entitled to impose a fee on customers who cancel their tickets and never fly.

**"*Passenger.*"** This statutory term appears both in section 44940(a) and in the statutory definition of "air transportation." *See* 49 U.S.C. § 40102(a)(5), (a)(23), (a)(25), (a)(27). Black's Law Dictionary's defines "passenger" as "[s]omeone who travels in a ship, airplane, boat, vehicle, etc., but without driving it or working aboard it; esp., a person taken by a common carrier under a contract of carriage or with the carrier's consent." *Passenger*, Black's Law Dictionary (12th ed. 2024). Two parts of that definition stand out: *travels*

and *taken*. Both imply actual conveyance from one place to another. Ordinary dictionaries similarly focus on "travel." *See, e.g.*, *Passenger*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("passenger" means "a traveler in a public or private conveyance"); *Passenger*, The Am. Heritage Dictionary (5th ed. 2012) ("passenger" means "[a] person who travels in a conveyance, such as a car or train"). The statute itself backs up this everyday meaning when it ties the fee to a "trip." *See* 49 U.S.C. § 44940(c)(1), (2); *Trip*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("trip" is a "voyage" or "journey"); *Trip*, The Am. Heritage Dictionary (5th ed. 2012) ("trip" means "[a] going from one place to another; journey").

***"Air transportation."*** Congress has defined "air transportation" in its intrastate, interstate, and foreign forms. 49 U.S.C. § 40102(a)(5), (a)(23), (a)(25), (a)(27). "[I]nterstate air transportation" means "transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft" between States. 49 U.S.C. § 40102(a)(25). "[I]ntrastate air transportation" means "transportation by a common carrier of passengers or property for compensation, entirely in the same State, by turbojet-powered aircraft capable of carrying at least 30 passengers." *Id*. § 40102(a)(27). "[F]oreign air transportation" means "transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft, between" the U.S. and a place outside the U.S. *Id*. § 40102(a)(23). All of these definitions explicitly refer to

the movement of a passenger (or property or mail) between or within geographic areas.

Because the statute does not provide a special definition of "transportation," courts apply ordinary meaning. *Feliciano v. Dep't of Trans.*, 145 S. Ct. 1284, 1291 (2025); *Calumet Shreveport Refining, L.L.C. v. EPA*, 86 F.4th 1121, 1138 (5th Cir. 2023) ("Where Congress does not furnish a definition of its own, we generally seek to afford a statutory term 'its ordinary or natural meaning.'" (cleaned up)). Here, Black's Law Dictionary (12th Ed. 2024) defines "transportation" as "the movement of goods or persons from one place to another by a carrier." There is no evidence that Congress intended a different definition in 2001 or when it amended the statute at various points thereafter; indeed, transportation has implied the movement of persons since at least the 19th century. *E.g.*, *Gloucester Ferry Co. v. Pennsylvania*, 114 U.S. 196, 203 (1885) ("Transportation implies the taking up of persons or property at some point and putting them down at another."); *Transportation*, Black's Law Dictionary (4th ed. 1968) ("transportation" means "[t]he removal of goods or persons from one place to another, by a carrier"); *see also Transportation*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("transportation" is a "means of conveyance or travel from one place to another" and "public conveyance of passengers or goods esp. as a commercial enterprise"); *Transportation*, The Am. Heritage Dictionary (5th ed. 2012) ("transportation" means "[t]o carry from one place to another").

Putting these definitions of "passenger" and "air transportation" together permits only one conclusion: TSA is entitled to the security service fee for a customer who actually travels, that is, is transported from one place to another. Nothing in the statute authorizes TSA to retain security fees as to other persons.

***"Costs of providing civil aviation security services."*** This Court has a "duty to construe statutes, not isolated provisions." *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (citation and internal quotation marks omitted). Accordingly, "passenger" and "air transportation" must be read in conjunction with the express statutory purpose of the fee: "pay[ing] for" the "costs" of TSA's "security services." 49 U.S.C. § 44940(a). Those "costs" include salary, background checks, and training for screening personnel; the cost of the air marshals program; and the cost of training pilots and flight attendants. *Id.* § 44940(a)(1). A person who never reaches the airport never contributes to any of those costs. And since Congress declared that the security service fee must be "reasonably related to [TSA's] costs of providing services rendered," *id.* § 44940(b), the only conclusion is that no fee is available as to a purchaser who never actually travels.[2]

---

[2] Reinforcing the connection between the fee and TSA's security screening, Congress made the fee apply only to transportation "originating at airports in the United States" and expressly authorized an exemption for "any passenger enplaning at an airport in the United States that does not receive screening services." 49 U.S.C. § 44940(a)(1), (h).

21

**2.** The agency's final decisions now before this Court have no answer to this statutory analysis. To the extent the decisions engage the statutory text at all, they claim that the statutory "phrase 'in air transportation' describes the types of air carrier operations that are covered, rather than the passengers themselves." AR1186, AR1297 (quoting 49 U.S.C. § 44940(a)(1)). This argument fails for multiple reasons.

As an initial matter, even if TSA were correct that the phrase "in air transportation" as used in 49 U.S.C. § 44940(a)(1) refers to the type of air carrier operations to which the security service fee applies, there must still be a "passenger of" such a carrier in order for a security service fee to be imposed. Here, when a customer cancels the ticket before he travels, he never becomes a "passenger." TSA cannot escape that term. And TSA offers no answer at all to the express statutory purpose of the security service fee to fund TSA's actual costs of security services provided to those "passengers."

Moreover, the term "air carrier" itself is defined in the statutory scheme as one "undertaking . . . to provide air transportation." 49 U.S.C. § 40102(a)(2), (21). And as set out above, the term *transportation* is necessarily tied to someone or something being transported—a passenger. Even if Congress were concerned with "the type of air carrier operations," that statutory language still requires someone to actually travel before a fee can be imposed. And, for the reasons above, the more natural reading of the text refers to the conduct in which passengers must engage in order to trigger a security service fee.

In any event, the decisions below overlook subsection (c)(1)'s require-ment that there be a "trip in air transportation." There is no mention of "car-rier" or carrier operations in that subsection, so that cannot be what the phrase "in air transportation" is describing. Instead, "in air transportation" modifies the word "trip," which in this context means "to make a journey." *Supra* p. 19.

Finally, it bears emphasis that TSA's position leads to absurd results. TSA had staked out the position that "unambiguous" statutory text entitled TSA to the security service fee "when air transportation is sold . . . irrespec-tive of actual travel." AR1186, AR1297 (capitalization altered). But if that were true, then TSA would be entitled to the security service fee even as to refundable tickets that are canceled and refunded to the customer's original method of payment in full. That cannot be right. *Cf. Southwest Airlines*, 2025 WL 841847, at *7 ("the Government's interpretation of the statutory lan-guage suggests that CBP would be entitled to a fee regardless of whether the carrier issues a refund"). This Court should not indulge TSA's Janus-faced claims that customers are always entitled to refunds upon request, and yet TSA earns entitlement to fees when they are collected regardless of what happens later.

**3.** The Court of International Trade endorsed the same reasoning South-west advances here in ruling for Southwest in a similar challenge involving an analogous fee regime administered by U.S. Customs and Border Protec-tion. The Court of International Trade considered whether CBP was entitled

23

to inspection fees collected for certain international airline tickets that were later canceled and never used. *See* 2025 WL 841847, at *6. The relevant statute, 19 U.S.C. § 58c(a)(5)(A), authorizes CBP to collect fees "for the provision of customs services in connection with . . . the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States." The statute also contains a collection provision requiring airlines to collect the fee when the ticket is issued and remit it to CBP. *See id*. § 58c(d).

Like TSA here, the government in *Southwest Airlines* argued that once an airline collects the fee, it must remit it to the agency, whether or not the passenger ever flies. But the court squarely rejected that reasoning. Carefully parsing the statutory text, context, and structure, the court concluded that CBP is entitled to a fee only when a passenger actually arrives on a plane in the United States and CBP provides customs services in connection with that arrival. 2025 WL 841847, at *5-7. It reasoned that an interpretation like the government's—that detached the fee from the services it was designed to compensate—was inconsistent with the statute. *Id.* at *6. As the court explained, the "collection" provision cannot override the central condition for the fee—that there be an arriving passenger to whom CBP can provide services. *Id.*

The court also pointed to CBP's own audit practices to reinforce its reading. CBP sought to recover fees only for tickets that were canceled for RTFs that were never used. It did not demand payment for canceled tickets where the RTFs were later used to book travel. That enforcement pattern confirmed

what the statute already showed: CBP has no claim to a fee where no passenger arrives and where no customs services are rendered. *Id.* at *7.

This Court should follow the same chain of reasoning. When a fee is conditioned on the agency providing a particular service to a particular type of person, and the service is never provided because the type of person does not materialize, the agency cannot keep the fee.

## B. Section 44940's Ancillary Provisions Do Not Support TSA's View.

Unable to contest the core operative language of section 44940(a), the final decisions below looked instead to a different subsection: the administrative provisions set out in section 44940(e). According to the decisions below, these provisions "unambiguously" state "that it is when air transportation is sold that '[a] fee imposed under subsection (a)(1) shall be collected by the air carrier.'" AR1186-87, AR1298 (emphasis omitted) (quoting 49 U.S.C. § 44940(e)(2)). TSA appears to reason that if the security service fee must be collected at the time of sale, then whether the purchaser ultimately becomes a "passenger" is irrelevant. AR1184, AR1295; *see also* AR1186-87, AR1297-98.

This argument is wrong for at least two reasons.

**1.** The statute does not require air carriers to impose the fee when the ticket is sold, and TSA errs badly in suggesting otherwise. AR1184, AR1295 (claiming that section 44940(e)(2) obligates an airline to "collect[] the Fee when air transportation is sold"). Instead, that statutory provision reads: "A fee imposed under subsection (a)(1) shall be collected by the air carrier or

foreign air carrier that sells a ticket for transportation described in subsection (a)(1)." 49 U.S.C. § 44940(e)(2). It addresses only who is responsible for collecting the security service (the "carrier that sells a ticket"), not when the security service fee must be collected.

When Congress wants to apply a tax or fee when a product is sold, it knows how to do so in clear language. Take, for example, the customs user fee statute at issue in the *Southwest Airlines* dispute recently decided by the Court of International Trade. That statute directs sellers to "collect from that individual the fee charged under subsection (a)(5) *at the time the document or ticket is issued*." 19 U.S.C. § 58c(d)(1) (emphasis added). Congress could have used similar language in the security service fee statute, but it did not. *See Jones v. Hendrix*, 599 U.S. 465, 477-78 (2023) (stating that Congress knows how to use particular language and where Congress omits words used in other statutes or provisions of the same statute, it intentionally does so); *Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006).

Similarly, 26 U.S.C. §§ 4261(a), (b)(1), and (c)(1) impose excise taxes on the "amount paid" by customers for various types of transportation, thereby triggering the tax upon the sale of the ticket. Again, Congress could have used similar language in section 44940(e)(2) but chose not to.

**2.** Even if TSA were correct that air carriers must impose the fee at the point of sale, there is no plausible basis to conclude that ancillary provisions buried in subsection (e)(2)'s administrative nuts-and-bolts override the core operative provision at the heart of the law. This Court must assess statutes

as a whole, not cherry-pick isolated terms. *Turkiye Halk Bankasi*, 598 U.S. at 275. And as set out above, the heart of the security fee statute is subsection (a)(1), which refers to passengers, transportation, and the security service fee's purpose of funding services used by passengers who actually travel. And other provisions refer to the (a)(1) fee as applying to a "trip" or "transportation of a passenger." 49 U.S.C. § 44940(c)(1), (d)(2). To disregard those overwhelming statements of congressional intent in favor of isolated backend provisions defies bedrock rules of statutory interpretation. *See Sackett v. EPA*, 598 U.S. 651, 677 (2023) (holding that Congress does not alter "the fundamental details of a regulatory scheme in vague terms or ancillary provisions" (citation omitted)); *see also Jama v. Immigr. Customs Enf't*, 543 U.S. 335, 344 (2005) (noting that statutory language in an indented subpart relates only to that subpart).

The Court of International Trade recently recognized as much in the analogous user-fee dispute. As noted above, unlike section 44940, the Customs user fee statute actually requires an airline to collect the Customs user fee "at the time the document or ticket is issued." 19 U.S.C. § 58c(d)(1)(A). And, similar to 49 U.S.C. §§ 44940(e)(1) and (3), the Customs user fee statute generally requires airlines to remit collected fees to the government. 19 U.S.C. § 58c(d)(3).

Nonetheless, the Court of International Trade held that the "statute as a whole provides that CBP is entitled to the fee based on the provision of customs services in connection with the arrival of a passenger, not upon the

27

carrier's collection of the funds." *Southwest Airlines*, 2025 WL 841847, at *6. The Court of International Trade explained:

> [A]n interpretation of [19 U.S.C. § 58c(d)] that would entitle CBP to funds based on collection alone relies on a single, isolated provision within the statute. The text upon which the Government relies appears in a "collection" provision describing the general process for collection and remittance and does not dictate whether CBP is entitled to the funds. This provision cannot be read in isolation to suggest that CBP's entitlement to the fee is based entirely on the mere collection of the funds when the rest of the statute continuously connects the fee to the customs services rendered in connection with the arrival of each passenger.

*Id*. (citations omitted). The same is true here, even assuming arguendo that 49 U.S.C. § 44940(e) requires the collection of a security service fee at the time the ticket is sold (which it does not).

## C.  TSA's Regulations and Informal Guidance Do Not Overcome the Statute.

To the extent TSA claims entitlement to the disputed fees based not on the statute, but on its own regulations and informal guidance, TSA errs.[3]

**1.** As an initial matter, TSA's own regulations largely track the statutory language and doom TSA's position for the same reasons. For example, 49 C.F.R. § 1510.1 emphasizes, just like the statute, that the security service fee is "to be paid by passengers . . . in air transportation." Likewise, 49 C.F.R. § 1510.5 limits security service fees to "$5.60 per one-way trip for air

---

[3] Even if TSA's regulations and informal guidance could overcome statutory text, their application here against Southwest would violate the fair-notice doctrine, for the reasons explained below in Part III.

transportation originating at an airport in the United States," not to exceed "$11.20 per round trip." Another regulation defines "air transportation" as "the carriage by aircraft of persons for compensation or hire." *Id*. § 1510.3.

Accordingly, as with the underlying statute, the regulations provide that no amount is owed to TSA unless there is a "trip" and a "passenger" and unless that passenger was "carri[ed] by aircraft," none of which occurs if the ticket is canceled.

**2.** Undaunted, TSA invokes numerous regulations governing other aspects of the security service fee. *See, e.g.*, AR3, AR1185, AR1187-89, AR1296, AR1298-1300. Most of these provisions do not address whether a customer who cancels his ticket rather than traveling can qualify as a "passenger." Instead, these provisions *assume* the applicability of a security service fee under 49 U.S.C. § 44940(a)(1). *See* 49 C.F.R. § 1510.11(b) ("[s]ecurity service fees"); *id.* § 1510.11(c) ("security service fees"); *id.* § 1510.13(a) ("security service fees"); *id.* § 1510.13(c) ("security service fees"). TSA's reliance on these provisions simply begs the question.

The last regulatory provision TSA cites—section 1510.9(b)—affirmatively contradicts its position. Under that provision, the security service fee is initially "based on the air travel itinerary at the time the air transportation is sold," but "[a]ny changes by the passenger to the itinerary" can result in "additional collection or refund of the security service fee." 49 C.F.R. § 1510.9(b). Far from entitling TSA to a security service fee for canceled tickets, this provision makes clear that, even in TSA's view, the final security

service fee must be based on travel that actually occurs, not merely an initial itinerary. Moreover, the regulation speaks to itinerary "changes," not cancellations. The regulation does not require Southwest to change the way it handles *canceled* tickets, let alone support TSA's claim to fee amounts associated with those cancellations.

In any event, even if these regulations supported TSA's position (and they do not), they would remain irrelevant. Regulations do not trump statutes. Here, Congress limited the security service fee to "passengers," 49 U.S.C. § 44940(a)(1), and nothing TSA inserts into the Code of Federal Regulations can change that. Much less can TSA's "guidance documents," *see* AR3-4; AR652, override statutory limits. *See Southwest Airlines*, 2025 WL 841847, at *8 ("the Guidance Letters cannot be read to independently grant CBP the authority to collect customs inspection fees where no passenger travels and CBP provides no customs services").

\* \* \*

Congress has never authorized TSA to retain security service fees under the circumstances presented here. And TSA not only lacks power to authorize itself to collect fees contrary to congressional authorization, but it has not even tried to do so here. That ends this case. The Court should grant the Petition for Review, vacate the final decisions, and order TSA to return to Southwest the disputed funds.

## II. Southwest Is Not Liable Because It Refunded the Security Service Fee to Its Customers When They Canceled Their Tickets.

The most straightforward way to resolve this Petition is to hold that Congress has not authorized security service fees when a customer cancels his ticket and never becomes a passenger on a plane. But TSA is wrong for a second, independent reason too: Southwest refunded any security service fee when it issued an RTF, regardless of whether that RTF expired.

That matters because TSA concedes that it is not entitled to a security service fee for a canceled ticket if Southwest refunds the fee to the customer. *See* AR4 (allowing an "offset" if a carrier "refunds the fee to a ticket purchaser"); AR652 (allowing "air carriers to offset Passenger Fee refunds to passengers").

TSA further agrees that, although "refund" is not defined in any statute or regulation, an RTF is a refund if the customer uses that RTF to purchase a new ticket. The audits did not find fault with transactions in which the customer used an RTF before it expired. Instead, "[t]he entire [alleged] liability in the Claim and Audit Report relates to instances where . . . the RTF later expired unused." AR1201. In the auditors' view, "whether an RTF constitutes a refund" depends on whether the RTF "expires unused or is used to purchase new air transportation." AR69; AR693. Thus, TSA's decisions in this case were based on the fact that the RTFs at issue "ultimately expired." AR1185; AR1296; *see also, e.g.*, AR1188 ("when a RTF expires"); AR1189 ("an expiring RTF"); AR1191 ("expiring credit").

TSA's effort to exclude unused RTF from the meaning of "refunds" is inconsistent with the well-settled principle that merchants' credits are a refund. "[T]he plain ordinary meaning of a 'refund' encompasses concepts of distribution by either cash or credit" and "[r]efunds may be issued in cash or in credit." *Davis v. Cent. Ala. Electric Coop.*, No. 15-0131, 2015 WL 5285894, *5 n.7 (S.D. Ala. Sept. 8, 2015). "For example, modern consumers who return purchases to retailers are well accustomed to receiving refunds in the form of store credit, rather than cash." *Id.* "Innumerable examples can be found—both inside and outside the law—of 'refunds' made via credit to an account rather than cash on the barrelhead." *Id.*; *see also, e.g.*, *Caver v. Cent. Ala. Electric Coop.*, 845 F.3d 1135, 1148 (11th Cir. 2017) (recognizing that a credit qualifies as a "patronage refund").

Federal agencies often treat credit as a refund. For example, the Department of Transportation requires airlines to disclose a "summary of the applicable policy regarding the form of the refund for a change or cancellation (*e.g.*, a credit to the original form of payment, airline credits or voucher) that apply." 14 C.F.R. § 399.85(f)(2)[4]; *see also* 89 Fed. Reg. 34620, 34651 (Apr. 30, 2024) (consumer group asked DOT "to require that airlines and ticket agents

---

[4] The regulation is currently stayed by order of this Court so DOT can consider comments regarding data DOT considered but which were not available during the notice-and-comment period. *Airlines for Am.*, 127 F.4th at 582 & n.15. The Court's reasoning had nothing to do with whether credit can qualify as a refund.

display information on whether any refund provided would be as a cash or a cash equivalent, non-expiring travel credits or vouchers, or expiring travel credits or vouchers").

Similarly, the Department of Agriculture describes "[i]nsurance policy refunds from mutual companies" as including "credits against subsequent purchases." 7 C.F.R. § 1767.41, 505.1. And the IRS has repeatedly held that merchant credits of various sorts qualify as "refunds." *See, e.g.*, Rev. Rul. 70-13, 1970-1 C.B. 272 (holding that a credit to a customer's capital account qualified as a refund under 26 U.S.C. § 6415(a)); Rev. Rul. 89-109, 1989-2 C.B. 232, 233 (approving "a refund by credit rather than by cash").

Even the auditors working for TSA understand that RTFs are refunds. *See* AR650 (government auditor explaining that "[t]he total amount paid for the canceled ticket (base fare plus all passenger taxes and fees associated with the itinerary) is refunded to the customer in the form of a residual travel fund (RTF)"). That is squarely in keeping with the other record evidence of common usage, including a 2017 *Forbes* article, Southwest's accounting systems, and communications to and from customers, all referring to RTFs (or to the synonymous term "travel credit") as "refunds." AR39-41, AR239-41, AR243, AR257, AR324-26, AR789-91, AR784-85, AR787, A795, AR800, AR1082-84, AR1189-90, AR1300.

None of these sources supports TSA's view that whether Southwest's issuance of an RTF is a refund depends on the *customer's* future decisions

about using that RTF. The Court should reject TSA's gerrymandered definition of "refund."

## III. The Orders Should be Vacated Because TSA Did Not Provide Fair Notice of Its View that Southwest's Refund Procedures Are Inadequate.

Because TSA's decisions rest on a previously unannounced interpretation of "refund," they are unlawful for failure to provide fair notice. Southwest has long implemented the security service fee in a straightforward way based on plain statutory text. TSA now advances a different view of the law, but it cannot retroactively fault Southwest and demand tens of millions of dollars based on an unexplained agency position.

"The fair notice doctrine is a 'basic principle of administrative law.'" *CFTC v. EOX Holdings, L.L.C.*, 90 F.4th 439, 444 (5th Cir. 2024) (quoting *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017)). "In the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." *Id.* (quoting *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 578 (5th Cir. 2017)); *see also Gen. Electric Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995), *as corrected* (June 19, 1995) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)) ("[A]n agency may not deprive a party of property by imposing civil or criminal liability" absent sufficient "notice."). For a half century, this Court has rigorously enforced the principle that "statutes and

34

regulations which allow monetary penalties against those who violate them . . . must give . . . fair warning of the conduct it prohibits or requires, and it must provide a reasonably clear standard of culpability to circumscribe the discretion of the enforcing authority and its agents." *Diamond Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976).

Here, the record shows (and TSA has never disputed) that Southwest has "been handling canceled tickets and RTFs the same way for many years" prior to the initiation of TSA's audits at issue here, including during periods previously audited by TSA. AR772. Yet TSA now claims that Southwest's practices have been unlawful all along. That is the exact type of retroactive-regulation-by-ambush that the fair-notice doctrine forecloses.

## A. TSA Did Not Declare Its Position Until After Most of the Transactions at Issue in This Petition.

Today, TSA advances the view that expired RTFs are not refunds, thereby entitling TSA to an associated security service fee, but TSA did not announce that view to Southwest until 2018, after most of the transactions at issue, when it sent an audit report to Southwest. AR70-72. Its first effort to publicly explain its position that expired credit does not constitute a refund came in the informal 2020 guidance document discussed above. *See supra* p. 7; AR652. That document claims, without citing any authority, that: "Retaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund. If an air carrier does

35

not refund the Passenger Fee to the passenger, the fee shall be remitted or remain with TSA." AR652. Until that moment, TSA had not publicly expressed any indication of its view that expired credits do not constitute refunds.

If there is a reason TSA could not publicly express that position until 2020, it has never articulated it. TSA has been aware of legal questions associated with the security service fee from the moment Congress enacted section 44940. As set out above, *supra* pp. 5-6, TSA issued both regulations and an informal 2002 guidance document, both purporting to address the collection and refunding of security service fees. Neither suggested that credits like RTFs are not refunds when they expire unused. And in the nearly two decades between the 2002 guidance letter and the 2020 guidance document, TSA never once expressed any view that Southwest's refund practices did not comport with the security fee statute, except for in the audits that are at issue in this case.

The fair notice doctrine thus dooms the final decisions under review here. In this Petition, Southwest challenges TSA's final decisions as to audits covering periods from 2015 through 2019. *See* AR1181 (addressing "an audit of air transportation sold between January 1, 2015 and October 31, 2016"); AR1292 (addressing "an audit of air transportation sold between November 1, 2016 and March 31, 2019"). All of the transactions in those time periods took place before the 2020 guidance document, and most of those transactions took place before TSA sent Southwest the first audit report on July 12,

2018. AR70-72. Southwest never had fair notice that TSA viewed as unlawful its practices during those time periods. Accordingly, TSA's final decisions imposing extraordinary financial liability should be vacated. *See EOX Holdings*, 90 F.4th at 444 *Gen. Electric*, 53 F.3d at 1328-29; *Diamond Roofing*, 528 F.2d at 649.

### B. Southwest Could Not Have Reasonably Guessed TSA's Unnatural View of the Law, Which Has Shifted Multiple Times.

It was especially important that TSA provide fair notice because its legal position does not comport with the plain language of the statute or common business practice. As explained above, TSA entirely ignores the limited nature of its authority to impose the security service fee only "on passengers," 49 U.S.C. § 44940(a)(1), and it claims that when an RTF expires unused, the associated fee amount is not actually refunded and thus "belongs to the United States." *See* AR1191-92. No industry participant could have reasonably foreseen such an unnatural view of the law, which runs contrary to how countless industries handle refunds.

**1.** TSA promotes a definition of "refund" that depends not on what the merchant issues at the moment of issuance, but on what the customer does with it in the future: "The determination as to whether an RTF constitutes a refund . . . cannot be made until the RTF either expires unused or is used to purchase new air transportation . . . ." AR69, AR693. A simple hypothetical illustrates why that position makes no sense. Suppose a customer buys a refundable ticket in cash. The customer's plans then change, and he cancels the

ticket. The airline does not issue cash refunds; it writes him a check for the full amount the customer paid. But the customer never gets around to visiting his bank to cash the check, and the check expires unused, like all checks eventually do when they are not cashed. *See, e.g.*, Tex. Bus. & Com. Code § 4.404 ("A bank is under no obligation to a customer having a checking account to pay a check, other than a certified check, that is presented more than six months after its date, but it may charge its customer's account for a payment made thereafter in good faith."). Would any ordinary English speaker dispute that the customer received a refund? Of course not. Yet TSA's position would require the conclusion that the uncashed check *foreclosed* a refund, because whether a remittance counts as a refund depends entirely on what the recipient does with it. *See* AR69, AR693; *cf. United Airlines, Inc. v. United States*, 111 F.3d 551, 553-55 (7th Cir. 1997) (rejecting similar view in the taxation context).

TSA's view not only departs from common usage but also invites all sorts of practical problems. Suppose a Southwest customer cancels a ticket, receives an RTF, and uses that RTF to purchase a new ticket. In that instance, according to TSA, the RTF counts as a refund, meaning the security service fee is paid only once, not twice. *See* AR25. But if a Southwest customer cancels a ticket, receives an RTF that expires unused, and purchases a new ticket in cash, TSA claims that the security service fee should be paid twice, not once. *See* AR1185 (claiming that "[f]ee amounts . . . were not returned directly to the passengers" when "RTFs . . . ultimately expired"). It is hard to imagine

how that view could be correct: in both scenarios, the customer becomes a passenger only once, yet in the latter scenario, TSA gets double the fee.

**2.** Even more troubling is that TSA has often shifted positions on what constitutes a "refund." In 2017, the first audit report stated: "[t]he determination as to whether an RTF constitutes a refund of any collected September 11th Security Fees cannot be made until the RTF either expires unused or is used to purchase new air transportation." AR69. But just three years later, the 2020 guidance document stated that "providing credit towards future services, with or without an expiration, does not constitute a refund." AR652. In only three years, TSA went from claiming that RTFs are refunds when they are used to claiming that RTFs are never refunds regardless of whether they are used.

It gets worse: TSA switched positions again *the next year*. The second audit report notes the 2020 guidance document's position that credit is not a refund, AR661, but nonetheless concludes that "[t]he determination as to whether an RTF constitutes a refund of any collected TSA Security Fees cannot be made until the RTF either expires unused or is used to purchase new air transportation." AR693. The final decisions adopt that view; they contend only that expired RTFs fail to qualify as refunds. AR1189-91, AR1300-02. It is difficult to understand how any airline can be expected to make sense of this ever-shifting regulatory landscape.

**3.** There should be no doubt that Southwest was eminently reasonable to expect that TSA would consider RTFs a refund regardless of the

customer's actions. RTFs are no different from "store credit," the typical approach to refunds in countless industries. *See supra* pp. 31-32. No one knew or could have reasonably imagined that TSA would treat an RTF as a refund only if the customer uses it before it expires.

It thus is no surprise that multiple airlines are currently in litigation against TSA over this same issue. There are petitions for review pending in at least three other circuits, all contesting TSA's view of the security service fee statute. *See Alaska Airlines, Inc. v. Transp. Sec. Admin.*, No. 25-954 (9th Cir. filed Feb. 13, 2025); *Allegiant Travel Co. v. Transp. Sec. Admin.*, No. 25-960 (9th Cir. filed Feb. 13, 2025); *Frontier Airlines, Inc. v. Dep't of Homeland Sec.*, No. 25-9523 (10th Cir. filed Feb. 12, 2025); *Spirit Airlines, Inc. v. Transp. Sec. Admin.*, No. 25-10461 (11th Cir. filed Feb. 12, 2025). TSA owed the air transportation industry better than to advance an unnatural reading of a critical statute and wield it to retroactively demand tens of millions of dollars (or more) in unearned fees for security services it never provided.

## CONCLUSION

The Petition for Review should be granted, TSA's final decisions should be set aside, and TSA should be ordered to refund the amounts at issue to Southwest.

Respectfully submitted.

Jonathan F. Cohn
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
(512) 693-8350

Adam P. Feinberg
MILLER & CHEVALIER CHARTERED
900 Sixteenth St. NW
Washington, DC 20006
(202) 626-5800

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins
   *Counsel of Record*
William T. Thompson
Todd L. Disher
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
kyle@lehotskykeller.com

41

## CERTIFICATE OF SERVICE

I certify that on May 29, 2025 this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins

## CERTIFICATES OF COMPLIANCE

I certify that this brief: (1) complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,270 words, excluding the parts of the brief exempted by Rule 32(f); and (2) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Palatino Linotype) using Microsoft Word (the same program used to calculate the word count).

I further certify that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Kyle D. Hawkins*
Kyle D. Hawkins